UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-CV-81475-WM

IN THE MATTER OF THE
EXTRADITION OF
SHAWN ABRAHAM SHAW,
a/k/a SHAWN ABRAHAM.

_____/



FILED by _____ D.C.

**MAY 2 8 2015**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

### CERTIFICATION OF EXTRADITABILITY,
### ORDER OF COMMITMENT
### AND INCORPORATED MEMORANDUM OPINION

THIS CAUSE came before the Court for an extradition hearing on March 25, 2015 [DEs 76, 79]. The United States of America, acting on behalf of the Kingdom of Thailand, submitted a request for an order certifying the extradition of Shawn Abraham Shaw, a/k/a Shawn Abraham (hereinafter "Defendant") to Thailand on the charges of deprivation of liberty of person, unlawful detention, kidnapping, extortion, and robbery [DEs 3, 53]. For the reasons stated below, this Court **GRANTS** the request for an order certifying extradition.

### I.      PROCEDURAL BACKGROUND

On November 25, 2014, the United States Attorney's Office filed a "Complaint For Provisional Arrest With A View Towards Extradition (18 U.S.C. 3184)" (hereinafter "Complaint") [DE 3]. In that Complaint, the Government sought the issuance of a provisional arrest warrant for Defendant based upon a request from the Kingdom of Thailand pursuant to the treaty of extradition between the United States and Thailand [DE 3]. On November 25, 2014, the Court issued an arrest warrant for Shawn Abraham Shaw, a/k/a Shawn Abraham, and the Defendant was arrested by the United States Marshal on November 26, 2014 [DE 14].

The Court set the extradition hearing for January 28, 2015 and also set a status report re:

extradition for January 26, 2015 [DEs 21, 34]. At the January 26, 2015 status report hearing, the Government provided the Court and the Defendant with the Formal Request for Extradition, and the Defendant sought a continuance of the scheduled January 28, 2015 extradition hearing [DEs 45, 53]. Per the Defendant's request, the extradition hearing was reset to March 3, 2015 [DE 55]. The Defendant thereafter sought a continuance of the scheduled March 3, 2015 extradition hearing [DE 60]. The Court granted the Defendant's motion and reset the extradition hearing for March 25, 2015 [DE 61]. On March 23, 2015, the Defendant once again moved for a continuance of the scheduled March 25, 2015 extradition hearing [DE 71]. The Court denied the Defendant's motion to continue and the extradition hearing was held on March 25, 2015 [DEs 76, 79].

Prior to the March 25, 2015 extradition hearing, the Defendant, through counsel, filed his Response in Opposition to the United States' Memorandum in Support of Extradition to Thailand [DE 72]. At the conclusion of the March 25, 2015 extradition hearing, defense counsel requested time to file a post-hearing memorandum. The Court granted that request. [DEs 76, 79]. Subsequent to the extradition hearing, the Court received Defendant's *pro se* post-hearing memorandum[1] [DE 83], the government's response [DE 84] and Defendant's *pro se* Reply [DE

---

[1] On March 30, 2015, five days after the conclusion of the extradition hearing, the Defendant's third court-appointed attorney, Jason W. Kreiss, Esq., moved to withdraw [DE 77]. At the April 1, 2015 hearing on Mr. Kreiss' motion to withdraw, the Defendant stated that he agreed with Mr. Kreiss' withdrawal and he made an *ore tenus* request to proceed *pro se* and represent himself. After a *Faretta* hearing, the Court granted the Defendant's request to proceed *pro se* [DE's 80, 81]. In light of this development, the Court gave the Defendant additional time until April 6, 2015 to file his post-hearing memorandum. Therefore, although the Defendant was represented by appointed counsel at all times prior to April 1, 2015, the Defendant is now proceeding *pro se* (with standby counsel Jason W, Kreiss, Esq.) and his post-hearing memorandum [DE 83] and all subsequent pleadings have been submitted as *pro se* filings.

88].[2]  On May 27, 2015, Defendant filed a *pro se* Motion to Dismiss with Prejudice [DE 102].

## II.    THE MARCH 25, 2015 EXTRADITION HEARING

At the March 25, 2015 extradition hearing, the government was represented by AUSA Stephanie D. Evans. The Defendant was present and represented by CJA counsel Jason W. Kreiss, Esq. At the request of the Government, the Court admitted Government's Composite Exhibit 1, which was the original authenticated Formal Request for Extradition with supporting Declarations and attachments [DEs 53, 76, 79].[3] The Defendant moved into evidence Defendant's Exhibits 1 through 5. Defendant's Exhibit 1 is a Federal Bureau of Investigation ("FBI") Visitor Information Form regarding a complaint made by Defendant's fiancée, Dawn Pasqualucci, to the FBI on January 23, 2014; Defendant's Exhibit 2 is a Chase online receipt for Dawn Pasqualucci's rental of Kamala Villa in Thailand for the period from December 8, 2013 through December 18, 2013;  Defendant's Exhibit 3 is a November 21, 2013 email from Defendant to his prior civil attorney, Brian Hardy, regarding review of a contract and LLC formation and stating that Defendant is going to Thailand on December 3, 2013;  Defendant's Exhibit 4 is an Affidavit of Brian R. Hardy, Esq., in which he states the following: 1) that he

---

[2] On April 16, 2015, as to the issue of the Court's denial of Defendant's request for bond, Defendant filed his *pro se* "Emergency Motion for Rehearing/Reconsideration and Evidentiary Hearing or in the Alternative de novo Review." [DE 91]. The Court directed the Government to respond to Defendant's Motion, and it submitted a Response in opposition [DE 95], to which Defendant replied [DE 100]. The Court is entering a separate Order on Defendant's Emergency Motion.

[3] In accordance with Article 9 of the applicable Treaty, all documents submitted by the Government of Thailand were transmitted through the diplomatic channel and therefore comply with the treaty with respect to authentication, without the need for certification by the United States Embassy in Bangkok. *See* Declaration of Elizabeth M.M. O'Connor, ¶ 6 [DE 53]; Government's Composite Exhibit 1 at Extradition Hearing [DE 76]. Accordingly, Government's Exhibit 1 was properly admitted.

was retained by Abraham Shameer[4] on or about November 14, 2013 regarding the protection and sale of certain of Shameer's intellectual property; 2) that Shameer determined it would be prudent to incorporate American Casino, LLC as a Nevada limited liability company; 3) that he was informed that Shameer was traveling to Thailand to meet with an individual who would either invest in or purchase the intellectual property; 4) that while Shameer was in Thailand, Hardy was advised by email that the parties had agreed upon a sales price for American Casino Exchange; 5) that Antonio Accornero had retained attorney Ronald J. Grant to represent him and a Nondisclosure and Confidentiality Agreement was returned to Hardy signed by Accornero; 6) that he worked with attorney Grant to finalize the terms of a purchase agreement; and 7) that he believed that he and Grant were working on a bona fide business transaction involving an asset sale between Shameer and Accornero. Attached to the Affidavit of Mr. Hardy are certain email exchanges and a copy of a Nondisclosure and Confidentiality Agreement purportedly signed by Accornero;  Defendant's Exhibit 5 is a transcript of the bond hearing held before this Court on January 28, 2015. The Defendant also made a statement to the Court at the extradition hearing. The parties stipulated that all evidence and testimony from the Defendant's bond hearing held on January 28, 2015 would be incorporated into the extradition hearing record and the Court accepted and approved that stipulation. Accordingly, in the following section, the Court will discuss the evidence and testimony admitted at the Defendant's January 28, 2015 bond hearing, as it has been deemed part of the extradition hearing record.

### III.    THE JANUARY 28, 2015 BOND HEARING

The Court held a lengthy bond hearing on January 28, 2015 and ultimately entered its

---

[4] Abraham Shameer is another name used by the Defendant.

4

Order Denying Bond In Extradition Proceeding [DE 58]. At that bond hearing, the Defendant sought to introduce several defense exhibits, which the Court admitted without Government objection. Defense Exhibit 1A is an attorney retainer agreement; Defense Exhibits 1B through 1N was a compilation of emails from November 21, 2013 through February 7, 2014, by and between Defendant and his civil counsel, and by and between Defendant's civil counsel and the alleged victim's civil counsel. These emails purportedly discuss a business deal between the alleged victim and the Defendant, whereby the two men agreed upon "a $2M price" after a meeting on December 15, 2013. *See* Defense Ex. 1D. According to defense counsel, these exhibits show that there was no kidnapping and extortion for the sum of two million dollars, but rather a business deal between Defendant and the alleged victim for two million dollars. Defense Exhibit 2 was a compilation of envelopes addressed to the Defendant, and in some cases to the Defendant and his fiancée, Dawn Pasqualucci, at 2774 South Ocean Blvd., Palm Beach, FL, 33480. According to defense counsel, these envelopes show that Defendant had a stable residence in Palm Beach County and is not a risk of flight. Defense Exhibit 3 was a copy of the face page of the United States passport of the Defendant and his fiancée. Defense Exhibit 4 was a print-out from the U.S. Marshals Service showing that Defendant has no prior arrests or convictions, although it does reflect two aliases for Defendant of "Shameer Abraham" and "Shawn Abraham." The defense submitted that the Defendant had legally changed his name from "Shameer Abraham" to "Shawn Abraham Shaw." The Defendant also proffered that the address of the villa rented by Defendant and his fiancée in Thailand in December, 2013, was incorrect in the formal extradition request submitted by Thailand, and that Defendant would

5

supplement the file with a document establishing this fact.[5]

The Defendant also called witness Dawn Pasqualucci. Ms. Pasqualucci testified that she is the Defendant's fiancée and that she and the Defendant traveled together to Thailand in December, 2013. She testified that she and the Defendant stayed together at a small villa in Thailand, but that the Defendant spent two nights without her at the luxurious residence of the alleged victim. She testified that Defendant was in Thailand to complete a business deal with the alleged victim, who was the Defendant's best friend. She testified that the Defendant told her that the alleged victim was a pedophile who liked little boys, and that, after Defendant found some incriminating evidence of pedophilia on the alleged victim's computer, the alleged victim threatened to kill both the Defendant and Ms. Pasqualucci if his proclivities were made public. Nonetheless, Ms. Pasqualucci testified that soon after that alleged death threat, the alleged victim spent two nights in the small villa that she and Defendant rented while in Thailand, and further, that the alleged victim let her look at a designer bag he owned similar to one she was interested in purchasing. She also testified that the two nights that the alleged victim stayed at her and Defendant's villa in Thailand were right after the date of the alleged kidnapping, robbery, and extortion, and yet she saw no signs of injury to the alleged victim; however she did notice a "bad rash" on both legs of the alleged victim. Ms. Pasqualucci testified that she and the Defendant returned to the United States from Thailand in December, 2013 as planned on the same return itinerary as originally scheduled and that they traveled routinely and not surreptitiously. She also testified that upon return to the United States in December, 2013, she and the Defendant resided in New York. While living in New York in 2014, Ms. Pasqualucci stated that she was followed

---

[5] Subsequent to the bond hearing, Defendant filed a Chase online receipt for a "Kamala Villa" rental [DE 57].

and harassed by a private investigator hired by the alleged victim. She reported this to the police and the FBI in 2014. She moved from New York to Florida in February, 2014, and Defendant moved to Florida in May, 2014, and they thereafter both lived together in an apartment on Palm Beach. This is the apartment where Defendant was located and arrested by the U.S. Marshals on November 26, 2014 pursuant to the arrest warrant issued in this case.

At the request of the Government, the Court took judicial notice of the authenticated original Formal Request For Extradition [DEs 53, 55]. The Government also presented the testimony of Deputy U.S. Marshal Damon Kubancek, who helped to locate and arrest the Defendant on the arrest warrant issued in this case. When he first received the international lead that Defendant was residing at 2274 South Ocean Blvd., Palm Beach, Florida, he checked various investigative indices and could not find any utility bills or other indications that Defendant was residing in Florida. He did additional checking and found that Ms. Pasqualucci, a woman associated with Defendant, resided at 2774 South Ocean Blvd., Palm Beach, Florida, and he and another Deputy Marshal set up surveillance there. They very quickly observed the Defendant at that apartment building, and after an arrest warrant was issued in this case, the Defendant was arrested without incident at that location. According to Deputy Kubancek, after Defendant's arrest and while the Defendant was being transported to the Federal Courthouse in West Palm Beach, the Defendant stated that he was an attorney who worked for a non-profit organization.[6] Further, when Deputy Kubancek met with Ms. Pasqualucci after Defendant's

---

[6] The evidence and testimony at the bond hearing established that although the Defendant did attend 2 years of law school, he is not an attorney.

arrest to turn over Defendant's watch to her, she told him that Defendant was an attorney.[7]

## IV      ANALYSIS OF APPLICABLE EXTRADITION LAW

Extradition hearings are conducted pursuant to 18 U.S.C. §§ 3184 - 3196. A foreign or international extradition proceeding is not a criminal case. *Martin v. Warden, Atlanta, Pen.*, 993 F.2d 824, 829 (11th Cir. 1993); *Kamrin v. United States*, 725 F.2d 1225, 1227-28 (9th Cir. 1984). "Foreign extraditions are *sui generis* in nature, neither civil nor criminal in nature and set forth their own law." *In re Extradition of Mohammad Safdar Gohir*, 2014 WL 2123402, at *6 (D. Nev. 2014); *In re Extradition of Vargas*, 978 F. Supp. 2d 734, 744 (S.D. Texas 2013). The process of formal extradition is a diplomatic process, governed generally by the applicable extradition treaty and the federal extradition statute, 18 U.S.C. §§ 3181–3196. *In re Extradition of Mohammad Sadfar Gohir, supra*, at *6.

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to international extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3); *Afanesjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005), *cert. denied,* 546 U.S. 993 (2005); *Melia v. United States*, 667 F.2d 300, 302 (2d Cir. 1981); *Bovio v. United States*, 989 F.2d 255, 259 n.3 (7th Cir. 1993).

"An extradition hearing is not a trial on the merits and does not require proof sufficient to satisfy the factfinder in a criminal trial." *Cheng Na-Yuet v. Hueston*, 734 F. Supp. 988, 995 (S.D. Fla. 1990). The purpose of an extradition proceeding is to decide the sufficiency of the charge under the treaty, not guilt or innocence. *See Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Afanasjev v. Hulburt, supra* at 1165 n.11; *Martin v. Warden, supra*, 993 F.2d at 828.

---

[7] In her testimony, Ms. Pasqualucci denied that she ever told any Deputy Marshal that Defendant was an attorney.

A certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g., Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-1434 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd* 28 F.3d 116 (11th Cir. 1994). "It is exceedingly rare for the Government to submit anything other than documents in support of an extradition request." *In re Extradition of Nunez-Garrido, supra*, 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011). According to the United States Supreme Court, "one of the principal objectives of the extradition statute is 'to obviate the necessity of confronting the accused with the witnesses against him' by enabling the requesting country to meet its burden of proof through documents subject only to requirements necessary to guarantee their authenticity." *Id.* (quoting *Bingham v. Bradley*, 241 U.S. 511, 517 (1916)). "Requiring the requesting country 'to send its citizens to another country to institute legal proceedings would defeat the whole object of the treaty.'" *Id.* (quoting *Bingham*, 241 U.S. at 517).

Although an extraditee is permitted to present evidence tending to explain or clarify the proof ("explanatory evidence"), evidence which tends merely to contradict the requesting country's case ("contradictory evidence") is inadmissible. *Cheng Na-Yuet*, 734 F. Supp. at 995. "Because of the circumscribed nature of an extradition proceeding, the importance of international obligations and the inherent practical difficulties in international proceedings, a defendant's right to challenge evidence against him at an extradition hearing is limited." *Nunez-Garrido,* 829 F. Supp. at 1281. "Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible."

*Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005) (quoting *Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999)); *see also Ordinola v. Hackman*, 478 F.3d 588, 608-09 (4th Cir. 2007); *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006). Courts have determined that affirmative defenses to the merits of the charge(s) are not to be considered at extradition hearings. *See Charlton v. Kelly*, 229 U.S. 447, 462 (1913); *Collins v. Loisel*, 259 U.S. 309, 316-17 (1922); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978); *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1112 (7th Cir. 1997). An extraditee is not permitted to introduce evidence that seeks to impeach the credibility of the demanding country's witnesses. *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993).

Extradition hearings are akin to a preliminary hearing. *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005). Accordingly, the magistrate judge "does not inquire into the guilt or innocence of the accused." *Id.* (quoting *Kastnerova v. United States*, 365 F.3d 980, 987 (11th Cir. 2004)). Instead, the magistrate judge only looks to see if there is evidence sufficient to show probable cause. *Id. See also Nunez-Garrido*, 829 F. Supp. 2d at 1282.

Extradition is primarily the prerogative of the executive branch. As stated by the Eleventh Circuit:

> Extradition ultimately remains an Executive function. After the courts have completed their limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender. The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not.

*Martin, supra*, 993 F.2d at 829. Because extradition is primarily the prerogative of the executive branch, the scope of the court's inquiry during an extradition hearing is limited. *See Hoxha*, 465 F.3d at 560. The central issue at an extradition hearing is whether there is competent evidence to

establish probable cause that the defendant committed the offense(s) underlying the request for extradition. *See Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996). The finding of probable cause is specifically required by 18 U.S.C. 3184. *See Hoxha, supra*, 465 F.3d at 560 (interpreting the "sufficient" evidence standard set forth in 18 U.S.C. 3184 as requiring probable cause); *See Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969)[8] (during a Section 3184 extradition hearing, a magistrate determines the sufficiency of evidence establishing reasonable ground for the accused's guilt), *cert. denied*, 398 U.S. 903 (1970). An extradition certification is in order where:

> (1) The judicial officer is authorized to conduct the extradition proceeding;
>
> (2) The court has jurisdiction over the fugitive;
>
> (3) The applicable treaty is in full force and effect;
>
> (4) The crimes for which surrender is requested are covered by the applicable treaty; and
>
> (5) There is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.

*See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir. 1994); *Hill v. United States*, 737 F.2d 950, 951 n.1 (11th Cir. 1984). Extradition is appropriate where "the magistrate has jurisdiction, [where] the offense charged is within the treaty and, by a somewhat liberal extension, [where] there [is] any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *See Fernandez*, 268 U.S. at 312.

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

The Court will now turn to the arguments against extradition which have been raised by Defendant.

## V.    THE DEFENDANT'S ARGUMENTS AGAINST EXTRADITION

The Defendant has raised numerous arguments against his extradition to Thailand, both at the extradition hearing and in written filings with this Court. On March 23, 2015, prior to the extradition hearing, the Defendant, through his court-appointed counsel Jason W. Kreiss, Esq., filed his Response in Opposition to United States' Memorandum In Support of Extradition to Thailand [DE 72]. Subsequent to the extradition hearing, the Defendant filed a *pro se* pleading [DE 83].[9]  The first part of that *pro se* pleading, entitled "Notice of Filing," comprises 66 handwritten pages of "Discussions," many paragraphs or portions of which are crossed out, stricken through, or circled [DE 83, pp. 1-69]. The second part of that pleading, entitled "Notice of Filing" of Defendant's "discussions and information," comprises handwritten pages 1 through 66 [DE 83-1, pp. 1-66] and handwritten pages 1 through 63 [DE 83-2, pp. 1-63]. The total post-hearing *pro se* filing comprises 198 handwritten pages [DE 83]. The Defendant also filed a Reply to the Government's post-hearing memorandum [DE 88]. On May 27, 2015, Defendant filed his *pro se* Motion to Dismiss with Prejudice [DE 102]. All of Defendant's arguments have been carefully considered by the Court. The Court summarizes and discusses Defendant's arguments below.

### A.  *The Possibility of the Death Penalty in Thailand:*

The Defendant asserts that if extradited to Thailand, he is potentially subject to the death penalty [DE 72, p. 2; DE 74]. The Defendant cites Article 6 of the applicable Treaty in support

---

[9] *See* f.n. 1, *supra.*

of this argument [DE 72, p. 2]. The Government asserts that Defendant will not be subject to the death penalty if extradited to Thailand [DE 73]. The Court finds that this issue is not relevant to the Court's decision as to whether it should certify extradition in this case.  In *Prasoprat v. Benov*, 421 F.3d 1009 (9th Cir. 2005), the court held that evidence regarding the use of the death penalty in Thailand was not relevant to the magistrate judge's inquiry in an extradition hearing. The Court stated, "[w]hen the offense for which extradition is sought is punishable by death, the question of whether to refuse extradition on that basis is within the authority of the executive branch, not the judicial branch." *Prasoprat*, 421 F.3d at 1015. This issue is left to the sole discretion of the executive branch and the Court will not interfere with the role and authority of the executive branch in this extradition proceeding.

Article 6 of the applicable Treaty does not change this result. Article 6 merely states that in a situation where the offense for which extradition is sought by the Requesting State (Thailand) is punishable by death under the laws of the Requesting State, but is not punishable by death under the laws of the Requested State (USA), then the "competent authority" of the Requested State may refuse extradition unless certain conditions are met. Important to this Court's analysis of this issue is the fact that Article 6 specifically defines the "competent authority" of the Requested State as the "Executive Authority."  Therefore, it is clear that it is up to the Executive branch of the United States to address the death penalty issue—not the Judicial branch. This Court cannot and will not invade the authority of the Executive branch in this extradition proceeding.

Further, under the rule of non-inquiry, the possibility that Defendant may face the death penalty in Thailand is not a matter that is relevant to this Court's limited role in this extradition

proceeding. The rule of non-inquiry precludes an extradition magistrate judge from assessing the investigative, judicial and penal systems of foreign nations when reviewing an extradition request. *See Neely v. Henkel*, 180 U.S. 109 (1901); *Martin, supra*, 993 F.2d at 829-30.

The Court will not deny a certification of extraditability on the basis that Defendant may face the death penalty in Thailand.  Such an argument is more appropriately made to the Executive branch.

### B. *Both the Defendant and Alleged Victim are U.S. Citizens:*

The Defendant asserts that since both he and the alleged victim are United States citizens, the Court should not certify extradition to Thailand.  In the bond context, the Eleventh Circuit has determined that American citizenship does not constitute a special circumstance justifying bond in an extradition proceeding. *See Martin v. Warden, supra*, 993 F.2d at 827-28; *see also In re Extradition of Sacirbegovic, supra*, 280 F. Supp. at 84. Likewise, it is clear that United States citizenship does not bar extradition by the United States. *Prasoprat v. Benov, supra*, 421 F.3d at 1017 n.6; *Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir. 1986).

Defendant argues that because both he and the alleged victim are United States citizens, Article 8 of the Treaty precludes extradition. [DE 83-2, p. 51]. Article 8 does state that: "Neither Contracting Party shall be bound to extradite its own nationals."  However, the next sentence of Article 8 states: "In a case in which the United States of America is the Requested State, the Executive Authority shall have the power to extradite its nationals if, in its discretion, it is deemed proper to do so." This portion of the Treaty clearly shows that it is up to the Executive branch, not the judicial branch, to decide whether or not to extradite one of its nationals. This is not a basis on which the Court should deny a certificate of extraditability. To do so would be to

invade the authority of the Executive branch in the extradition process.

The Court finds that the fact that both the Defendant and the alleged victim are American citizens is not a valid defense to the issuance of a certification of extraditability in this case.

## C. *Fabricated and Purchased Prosecution:*

The Defendant argues that extradition should be denied because the Thai prosecution is a fabricated one, purchased by the wealthy alleged victim [DE 83-1, p. 51]. Defendant alleges in his post-hearing memorandum that the Court is the "recipient of fabricated facts" and "a perfectly packaged web of lies" [DE 83-1, p. 13]. The Defendant attacks the alleged victim in his post-hearing memorandum, asserting that he is revengeful, sinister and murderous [DE 83-1, p.23]. The Defendant, however, presented no evidence or testimony to support this argument. Instead, the Defendant points to alleged inconsistencies within the formal extradition request including the exhibits submitted by the Thai government, and what the Defendant believes to be the incredulous nature of the allegations, to support his claim of a fabricated and purchased prosecution. Defendant argues that the statements provided by the witnesses "provide insight to the purchase" [DE 83-1, p. 51].

The Court rejects the Defendant's argument that the alleged victim's and witnesses' statements themselves establish a fabricated and purchased prosecution. The Court finds that there is insufficient support in the record for Defendant's assertion that the prosecution has been fabricated and purchased by the alleged victim. The Court will not deny a certification of extraditability on this basis.

## D. *No Probable Cause:*

The Defendant argues that there is no probable cause for the charges lodged against him

in Thailand [DE 72, p. 3; DE 83-2, pp. 35-57]. The Defendant asserts numerous reasons why probable cause is lacking. In summary, he argues that the facts underlying the charges brought against him in Thailand simply do not make sense. The evidence, according to the Defendant, is unreliable, contradictory, inconsistent, unbelievable, and inadmissible. Defendant points to numerous alleged inconsistencies in the statement of the alleged victim, Mr. Accornero. Some of these alleged inconsistencies are internal to Mr. Accornero's account of the incident, such as stating the crime occurred on different dates (December 19, 2013 vs. December 14-15, 2013). Some of these alleged inconsistencies are established, according to the Defendant, by evidence Defendant has submitted in defense of his extradition. Defendant argues that the facts asserted by Mr. Accornero are so incredible and bizarre as to be unworthy of belief. Defendant argues that he went to Thailand in December, 2013 to engage in legitimate business negotiations with Mr. Accornero, that he met with Accornero in Thailand solely for legitimate business purposes, that he arrived at an oral agreement in Thailand with Accornero to sell certain intellectual property for the purchase price of two million dollars, that he returned to the United States in a routine, non-surreptitious manner and then had his civil attorney negotiate the terms of a written agreement with Mr. Accornero's civil counsel. He asserts that aside from the asserted unreliable or inconsistent statements of the bar owner (Mr. Thangkampa) and Accornero's maid (Ms. Praserdthai), there is no corroborating evidence. He also points to the fact that Accornero did not report the alleged crimes until approximately 40 days after they allegedly occurred. Defendant further asserts that he is innocent of the charges brought against him in Thailand and attempts to advance argument, documents, and testimony in support of his asserted innocence. Defendant

16

attempts to make further arguments as well as to why probable cause is lacking.[10]

This Court's role in this extradition proceeding is not to determine the guilt or innocence of Defendant, but rather to determine whether probable cause exists to support the charges lodged against him in Thailand. "[P]robable cause requires only a probability or substantial chance of criminal activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Probable cause does not require an officer's suspicion to be more likely true than false. *Texas v. Brown*, 460 U.S. 730, 742 (1983). Probable cause means "'the existence of a reasonable ground to believe the accused guilty'" of the crime charged. *Escobedo v. United States*, 623 F.2d 1098, 1102 (5th Cir. 1980) (quoting *Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir. 1971)); *Nunez-Garrido*, 829 F. Supp. 2d at 1282. "Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *accord Escobedo v. United States, supra.*

As stated by the Honorable United States District Judge William Hoeveler over twenty-five years ago, an extraditee "cannot avoid extradition simply by contradicting the requesting country's case." *Cheng Na-Yuet, supra*, 734 F. Supp. at 995. After a careful review of the oral and written arguments made by Defendant, both *pro* se and through his prior court appointed counsel, it is clear to the Court that Defendant has consistently attempted to contradict the case

---

[10] Defendant repeatedly argues in his *pro se* post-hearing memorandum that this is a "highly unusual" case [DE 83-1, pp. 32-41], apparently referring to the Order Denying Bond In Extradition Proceeding where the Court stated, "Although the Court finds this to be a highly unusual case with what appears to be a very unusual defense, the fact of the matter is that a review of the formal extradition request submitted by Thailand [DE 53] does establish probable cause at this juncture." [DE 58, p. 13]. Merely because the facts of this case and the asserted defense to the charges are unusual or highly unusual does not mean there is a lack of probable cause. In fact, it is clear that there is sufficient probable cause for the charges brought against Defendant in Thailand.

brought against him in Thailand. He has continually sought to turn this limited extradition proceeding into a full trial in an effort to prove his asserted innocence. This the Defendant cannot do.

The facts of *Cheng Na-Yuet v. Hueston, supra*, are quite similar to the instant case. The Defendant in that case, Ms. Cheng Na-Yuet, was charged with kidnapping in Hong Kong after a coconspirator was apprehended and identified her as the mastermind of the kidnapping. Ms. Cheng Na-Yuet contested her extradition from the United States to Hong Kong by arguing that probable cause for the charges rested solely upon the unreliable testimony of one witness—Mr. Chan Kam Chuen. As in the instant case, Defendant Cheng Na-Yuet argued that the testimony of witness Chan Kam Chuen was so unreliable as to obliterate the showing of probable cause, and further, that his testimony was contradicted by the affidavit of another witness in the case. *Id.* at 996. Judge Hoeveler found that the asserted discrepancies were minor and did not wholly discredit either witness. Likewise, in the instant case, the Court finds that Defendant Shaw's asserted discrepancies in the statements of the alleged victim Mr. Accornero, the bar owner, Mr. Thangkampa, and the maid, Ms. Praserdthai, as well as other discrepancies asserted by Defendant, are also minor and do not wholly discredit the alleged victim, witnesses, or the evidence submitted by Thailand.

As pointed out by Judge Hoeveler, in order to defeat probable cause, "the extraditee must 'negate' or 'obliterate' the requesting country's showing of probable cause." *Id.* Judge Hoeveler went on to state:

> [I]n order to 'negate' Hong Kong's showing of probable cause, Petitioner must discredit the testimony relied upon by Hong Kong to the extent that this Court can find that there is not 'any evidence warranting the finding that there was reasonable ground to believe the accused guilty. Although some doubt as to the

> credibility of Chan Kam Chuen's version of what actually transpired is cast by the
> fact his testimony was provided while he was in prison awaiting sentencing for
> the very crime in which he was implicating Petitioner, the appropriate acid test for
> his testimony must take place at a trial on the merits, not on a motion for writ of
> habeas corpus.

*Id.* at 996. Clearly, in the instant case, Defendant Shaw has cast some doubt on the credibility of

Mr. Accornero, but his efforts fall far short of negating or obliterating probable cause. This is a

very difficult standard to meet and Defendant has not met it.

Defendant strenuously asserts that he is innocent as he was simply engaged in a

legitimate business transaction, only traveled to Thailand for a legitimate business venture, and

did not commit any crimes. He asserts that the witness statements are unbelievable with "unreal

details" [DE 83-2, p. 28]. This argument is quite similar to the argument made by Ms. Cheng Na-

Yuet as she asserted that she was involved in a legitimate business transaction, only traveled to

Hong Kong for a legitimate business venture, and did not commit any crimes. Therefore, she

argued, Hong Kong's version of the events was "highly improbable." *Id.* Judge Hoeveler found

that, "[a]lthough Petitioner has presented a set of facts which could be consistent with her

innocence, such presentation clearly fails to 'negate' the Hong Kong Government's showing of

probable cause." *Id.* In Defendant's case, he too has presented a set of facts which could be

consistent with his innocence, but his presentation clearly fails to negate or obliterate Thailand's

showing of probable cause.

Defendant Shaw cites *In re Extradition of Atta*, 706 F. Supp. 1032, 1050 (E.D.N.Y 1989)

and *In re Extradition of Contreras*, 800 F. Supp. 1462, 1464 (S.D. Tex. 1992) for the proposition

that, in the context of probable cause, this Court must enforce the Government's burden to

provide "evidence that is sufficient to cause a person of ordinary prudence and caution to

conscientiously entertain a reasonable belief of the accused's guilt." That definition is correct, however, *Atta* goes on to state: "[t]he primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination." *Atta*, 706 F. Supp. at 1050-51. The *Atta* Court found that probable cause existed based upon the totality of the circumstances and therefore certified extradition. *Id.* at 1051-52. The *Contreras* Court encountered a situation where the only evidence supporting probable cause in an extradition proceeding were 11 signed confessions or declarations from arrested persons asserting that Contreras was the source of the weapons. However, each of the 11 persons immediately recanted their confessions or declarations. Based upon the recantation, and the fact that no other evidence existed to establish probable cause, the Court denied extradition. *Contreras, supra*, 800 F. Supp. at 1469. In the instant case, there is no recantation by any of the witnesses against Shaw.

Defendant also cites *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358 (S.D. Fla. 1999), for the proposition that mere conclusory allegations do not satisfy the probable cause standard. [DE 72, p.3]. The Court agrees with that proposition. However, in the instant case, the evidence submitted by Thailand does not contain mere conclusory allegations, but rather direct testimony from the alleged victim and direct testimony from the corroborating witnesses. Further, the *Fernandez-Morris* Court noted that it "is not this Court's duty to determine whether evidence is sufficient to justify a conviction, but rather, to determine if the evidence is sufficient to hold the accused." *Id.* at 1365. The Defendant also cites *In re Sauvage*, 819 F. Supp. 896, 901 (S.D. Cal. 1993) for the proposition that the government must provide evidence supporting each element of each charge [DE 72, p.3]. The Court agrees with this legal proposition. However, the

20

*Sauvage* Court denied extradition because the French prosecutor's request for extradition did not state the source of their factual findings and merely relied on the prosecutor's conclusions. That is not the situation in Defendant Shaw's case.

The Court has very carefully reviewed and considered the formal extradition request submitted by Thailand [DE 53; DE 76, Govt. Composite Ex. 1]. The formal extradition request is quite lengthy and detailed, and includes:

1. A Declaration of Elizabeth M.M. O'Connor, an Attorney-Advisor in the Office of the Legal Adviser for the Department of State, Washington, D.C., together with Diplomatic Note 56001/993 formally requesting the extradition of Defendant as supplemented by Diplomatic Note 56001/59, and a copy of the applicable Treaty;

2. November 5, 2014 Request for Extradition from Thailand with attached Exhibits 1 through 13;

3. January 6, 2015 Supplementary Letter from Thailand regarding its prior November 5, 2014 Request for Extradition, with attached Exhibits 1 through 3.

A review of the above described documents, when considered in totality, leads to the inescapable conclusion that probable cause supports the charges brought against Defendant in Thailand. There is an affidavit of the police investigator, Lt. Col. Pitukkunthun, in which he details his investigation and the statements he took from the alleged victim, Mr. Accornero, and three additional witnesses, Mr. Thangkampa, Ms. Praserdthai, and Mrs. Poutrain Fernandez. In sum, the allegations are that Accornero and Defendant Shaw were friends, and on December 11, 2013, Shaw visited Accornero and asked to stay at his residence in the Kamala Sub-district for two nights. On December 13, 2013, both Accornero and Shaw went to a bar in the Patong beach area. After drinking a Coke, Accornero suddenly felt sleepy and about to faint, and so he asked Shaw to drive him home. While in the car with Shaw, Accornero noticed that his neck was tied to the car's headrest and his legs and hands were also tied. Accornero noticed that Shaw drove

21

past Accornero's house and arrived at house number 110/18, village no. 3, Kamala Sub-district. At that house, Accornero was chained on the ankles, tied on both wrists, and duct-taped on the mouth. Accornero was forced to lie on the floor next to a bed until the following morning, December 14, 2013. Shaw threatened to punch and harm Accornero if he did not give three million dollars (US) to Shaw. Accornero negotiated the price down to two million dollars to be paid to Shaw after Accornero was back in the United States. Accornero was detained one more night, until the morning of December 15, 2013, when Shaw took cash by force from Accornero's wallet and then released him during mid-day on December 15th. Accornero went back to his house, consulted with his friends, and then came to the investigator to formally lodge a complaint on January 24, 2014. Thereafter, on October 20, 2014, Accornero gave further statements to the police that after the incident he went back to the United States and that he and Shaw exchanged emails among themselves and their attorneys in which the two million dollar payment was demanded. Accornero stated that some of the emails contained implied threats to Accornero's family and friends. Further, Accornero stated that Shaw traveled to Italy to see Accornero's mother, implying threats to Accornero's family.

Lt. Col. Pitukkunthun's report also detailed the statements of three corroborating witnesses. The first was Mr. Thangkampa, who owns a bar in the Patong beach area. On the night of December 13, 2013, Thangkampa saw Accornero and Shaw sitting at the bar together. After Accornero drank a Coke Lite, he became sleepy and Shaw carried Accornero out of the bar. Several days later, Accornero told Thangkampa that he had been detained by Shaw and was so frightened that he was willing to transfer two million dollars (US) to Shaw. Thangkampa also saw marks on Accornero's wrist and ankle where he had been tied by Shaw. The second

22

corroborating witness was Ms. Praserdthai who has been working as Accornero's house maid for years. She was told to arrange a room for Shaw as he was a friend of Accornero coming from the United States to stay for two nights. She saw Accornero and Shaw leave the house together  and then on December 14, 2013, she saw Shaw return to the house and hurriedly pack his belongings. Shaw told her that Accornero was going to Bangkok. On December 15, 2013, Accornero drove himself to the property and was in a weary manner with marks on his arms, neck, wrist and ankle. The third corroborating witness was Mrs. Fernandez, the lessee of the house located at no. 110/18, village no. 3, Kamala Sub-district, referred to as the scene of the crime. She stated she rented the house to Shaw for six nights and he disappeared without returning the key to her. The formal extradition request also contains affidavits of Accornero, Thangkampa, Praserdthai and others, as well as photographs of Shaw and case related pictures, and documents.

In conclusion, the Court finds that the formal extradition request submitted by Thailand does establish probable cause for the charges brought against Defendant Shaw in Thailand.

### E. *Articles 4 and 8 of the Treaty:*

Defendant appears to argue that Articles 4 and 8 of the applicable treaty preclude this Court from issuing a certificate of extraditability. [DE 83-1, p.10; DE 83-2, pp. 49-54]. The Court has already addressed Article 8 in section V(B) above and will not repeat those findings.

As to Article 4, that section of the Treaty deals with "Dual Jurisdiction" and states:

> The Requested State may refuse to extradite a person claimed for a crime which is requested by its laws as having been committed in whole or in part in its territory or in a place treated as its territory, provided it shall proceed against the person for that crime according to its laws.

First, the Government has stated that there is no prosecution commenced or contemplated against Defendant in the United States. Therefore, Article 4 is inapplicable.

23

Second, the terms of Article 4 are discretionary, in that the Requested State (USA) *may* refuse to extradite a person if the requirements of that article are met. In an applicable case, such a discretionary decision is up to the Executive branch, not the judicial branch.

### F. *Constitutional Claims:*

Defendant briefly argues that he has been wrongfully arrested and incarcerated in this case, in violation of the Fourth and Fifth Amendments to the United States Constitution [DE 83-1, p. 43]. Defendant does not fully develop his argument. However, the Court sees no constitutional violation in a case where Defendant has been arrested pursuant to a lawfully-issued arrest warrant and held without bond in an extradition proceeding where such action is in accord with the applicable treaty and supported by probable cause and applicable law. In one portion of his post-hearing memorandum, Defendant cites *Nunez-Garrido, supra*, and *Martin v. Warden, Atlanta Pen., supra*, for the proposition that "the constitutional rights of individuals, including the right to due process, are superior to the Government's treaty obligations." [DE 83-1, p.12]. This Court agrees with that principle of law. However, as Defendant has suffered no due process violation or constitutional violation in this case, the Court will not deny a certification of extraditability on such basis.

### G. *A Military Junta Has Taken Over Thailand's Government:*

In his Response filed prior to the Extradition hearing, Defendant argued that "the democratically elected government of Thailand has been overthrown by the Junta military dictatorship in a *coup d'etat* in May, 2014" [DE 72, p. 2]. The Defendant asserts that "the treaty executed by President Ronald Reagan was negotiated with a government that is diametrically different from the military regime that is in power today in Thailand." [DE 72, pp. 1-2]. The

Defendant also makes this claim in his post-hearing memorandum, asserting further that Thailand's Constitution was dissolved. [DE 83-2, p. 53].

This Court is not in a position to make an evidentiary finding as to the current nature, makeup and efficacy of the Thailand government, its justice system, or its Constitution. Nor is it the proper role of this Court to undertake such an inquiry. Under the rule of non-inquiry, the United States judiciary does not have the authority to scrutinize the fairness of the requesting nation's legal system or examine the conditions that await an extraditee upon return, including the ability to provide for his or her security. *See United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997); *In re Extradition of Manzi*, 888 F.2d 204, 206 (1st Cir. 1989); *see also In re Extradition of Singh*, 123 F.R.D. 127, 131-40 (D.N.J. 1987) (reviewing conflicting case law and concluding that accused not entitled to offer evidence that he could not receive a fair trial if extradited to India).

In *Hoxha v. Levi*, 465 F.3d 554 (3d Cir. 2006), the defendant argued that if he was returned to Albania to face trial for murder, he would be subjected to torture and possibly murdered. *Id.* at 557. The district court noted these concerns and "strongly encouraged the State Department to 'seriously examine the charges.'" *Id.* at 563 n.13. Under the rule of non-inquiry, the Third Circuit upheld the district court's decision not to consider Hoxha's claim because "such humanitarian considerations are within the purview of the executive branch and generally should not be addressed by the courts in deciding whether petitioner is extraditable." *Id.* at 563. *See also Koskotas v. Roche*, 931 F.2d 169, 174 (1st Cir. 1991) (declining to consider defendant's concerns of his physical safety if returned to Greece because international comity would be ill-served by requiring foreign governments to submit their purposes and procedures to the scrutiny

25

of United States courts).

It is unknown if the allegations made by Defendant regarding the military coup are true or not, but they are quite serious. The Court urges the State Department to carefully review and examine Defendant's allegations. However, the Court shall not deny a certification of extraditability on this basis.

### H. *Dual Criminality:*

Defendant argues that the pending extradition proceeding should be dismissed in light of the Government's failure to satisfy the "dual criminality" requirement.[11]

Pursuant to Article 2 of the applicable treaty, "[a]n offense shall be an extraditable offense for prosecution . . . only if it is punishable under the laws of both Contracting Parties by imprisonment or other form of detention for a period of more than one year or by any greater punishment."

The Court finds that the Government has satisfied the "dual criminality" requirement. The documents contained in the extradition packet indicate that Defendant has been charged in Thailand with crimes relating to deprivation of the liberty of a person, unlawful detention, extortion, and robbery. According to the documents contained in the Government's Composite Exhibit 1, the offenses for which extradition is sought are punishable by imprisonment for more than one year under the Thai laws. Further, these alleged crimes violate sections 309, 310, 337, and 339 of the Thai Criminal Code, respectively, as stated in the Government's Composite Exhibit 1. Additionally, the crimes with which Defendant is charged in Thailand would subject Defendant to prosecution in the Southern District of Florida for false imprisonment, kidnapping,

---

[11] Defendant raises this argument in his May 27, 2015 *pro se* Motion to Dismiss with Prejudice [DE 102].

extortion, and robbery. These alleged crimes violate Florida Statutes sections 787.02, 787.01, 836.05, and 812.13, respectively. Moreover, the crimes with which Defendant is charged are punishable by more than one year in prison in both Thailand and the State of Florida. The requirement of dual criminality has clearly been satisfied in this case.

## I.  *Admissibility of Evidence:*

Defendant argues that, because the evidence presented by the Government in support of extradition is allegedly not admissible in Thailand, it is not admissible in a court in the United States. As a result, Defendant argues that the pending extradition proceeding should be dismissed.[12]

The Court finds that the Government has established that the evidence it presented in support of extradition is admissible.

United States Code Title 18, section 3190 provides that "properly and legally authenticated" documentary evidence such as "depositions, warrants, or other papers or copies thereof shall be admitted." 18 U.S.C. § 3190. Additionally, Article 9 of the applicable treaty in this pending extradition matter provides that "[d]ocuments transmitted through the diplomatic channel shall be admissible in extradition proceedings in the Requested State without further authentication, or other legislation."

Here, the Court notes that the documents submitted by the Government in this extradition proceeding are accompanied by a certification by Elizabeth M.M. O'Connor from the Office of the Legal Advisor for the Department of State, Washington, D.C., which attests that "[i]n accordance with Article 9 of the Treaty, all documents submitted by the Government of Thailand

---

[12] Defendant raises this argument in his May 27, 2015 *pro se* Motion to Dismiss with Prejudice [DE 102].

were transmitted through the diplomatic channel.   The documents submitted by Thailand therefore comply with the Treaty with respect to authentication, without need for certification by the U.S. Embassy in Bangkok." Further, there is a certificate signed by Secretary of State John Kerry stating that full faith and credit shall be due the acts of Attorney Advisor Elizabeth M.M. O'Connor. *See* Govt. Composite Ex. 1 [DEs 53, 57]. Pursuant to Article 9 and 18 U.S.C. section 3190, because the extradition packet was transmitted through the diplomatic channel, it was properly authenticated and constituted admissible evidence in this pending extradition proceeding.   Government's Composite Exhibit 1 was properly admitted at the extradition hearing.

## VI.   COURT'S FINDINGS AS TO EXTRADITION

The Court has carefully reviewed all the evidence, including the authenticated original Formal Request for Extradition together with all of its Declarations and exhibits, the Defendant's exhibits, the parties' arguments and filings, the Defendant's statement to the Court at the extradition hearing, and the evidence and testimony admitted at the bond hearing.

Based upon this review, the Court **FINDS** as follows:

1.  The undersigned judicial officer is authorized under Title 18, United States Code, Section 3184, to conduct an extradition hearing;

2.  The Court has personal jurisdiction over the defendant and subject matter jurisdiction over the case;

3.  There is currently in force an extradition treaty between the United States of America and the Kingdom of Thailand. TIAS, 43 Stat. 1749.

4.  The Defendant is charged in the requesting state [the Kingdom of Thailand] with the

28

criminal offenses of deprivation of liberty of person, unlawful detention, kidnapping, extortion and robbery;

5.  The criminal offenses of deprivation of liberty of person, unlawful detention, kidnapping, extortion and robbery are extraditable offenses within the meaning of Article 2 of the extradition treaty;

6.  The requesting state [the Kingdom of Thailand] seeks the extradition of the Defendant for the criminal offenses of deprivation of liberty of person, unlawful detention, kidnapping, extortion and robbery;

7.  There is probable cause to believe that Shawn Abraham Shaw, a/k/a Shawn Abraham, the Defendant brought before this Court, is the same person wanted by the Kingdom of Thailand, and further, there is probable cause to believe that said Defendant committed the crimes of deprivation of liberty of person, unlawful detention, kidnapping, extortion and robbery as charged against him in the Kingdom of Thailand.

For reasons set forth above, the Government's request for an order certifying the extradition of Shawn Abraham Shaw a/k/a Shawn Abraham is **GRANTED**. Defendant's *pro se* Motion to Dismiss with Prejudice [DE 102] is **DENIED**. As specified in 18 U.S.C. § 3184,

**IT IS THERFORE ORDERED** that a certified copy of this Certification of Extraditability and Order of Commitment, together with a copy of all the testimony and evidence taken before the undersigned, be forwarded without delay by the Clerk of the Court to the Secretary of State, Department of State, to the attention of the Office of the Legal Adviser, that a warrant may issue upon the requisition of the proper authorities of the Kingdom of Thailand, for the surrender of Defendant, according to the stipulations of the applicable treaty or convention,

and that Shawn Abraham Shaw, a/k/a Shawn Abraham, be committed to the custody of the United States Marshal for this District, to be held at the Federal Detention Center, Miami, Florida, or other suitable facility, pending final disposition of this matter by the Secretary of State and surrender of Defendant to the designated agents of the Government of Thailand.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 28th day of May, 2015.

William Matthewman

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

30